<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| VINCENT DINUZZO, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 05-0375 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| SOCIAL SECURITY ADMINISTRATION | : | |
| JO ANNE B. BARNHART, | : | |
| COMMISSIONER | : | |
| | : | |
| Defendant. | : | |

<u>**Chesler, District Judge**</u>

This matter comes before the Court on the appeal by Plaintiff Vincent Dinuzzo ("Dinuzzo") of the final decision of the Commissioner of Social Security ("the Commissioner") determining that he is not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). This Court exercises jurisdiction under 42 U.S.C. § 405(g). Having considered the submissions of the parties pursuant to L. Civ. R. 9.1, and for the reasons that follow, the Court finds that the Commissioner's decision was supported by substantial evidence and is hereby **AFFIRMED,** and Plaintiff's appeal is **DENIED**.

**I.   FACTS**

   **A.   Background**

Plaintiff, Vincent Dinuzzo, born on August 7, 1948, attended school in Italy through eighth grade. According to the record, Plaintiff was the owner and manager of the Gatsby

1

Lounge, a restaurant-bar, from 1987 to 2000. (T. 51, 90.)[1] Plaintiff sustained injuries to his neck and back as a result of his involvement in a motor vehicle accident on January 24, 1999. (T. 226.) Since the onset of his injuries, Plaintiff has not engaged in any substantial gainful activity. (T. 17, 89.) Plaintiff's earning records demonstrate that he as acquired sufficient quarters of coverage to remain insured only through December 31, 1999. (T. 17.) He brings this action as an appeal of an administrative law judge's decision denying him benefits under the Social Security Act.

    **B.**    **Procedural History**

Plaintiff applied for Disability Insurance Benefits on September 3, 2002 and alleged disability since January 25, 1999. (T. 49.) His application was denied initially and upon reconsideration. (T. 20-21, 24-28, 33-35.) Plaintiff requested an ALJ hearing (T. 36) which was held on December 9, 2003. (T. 223-57.) On January 7, 2004, ALJ Ralph J. Muehlig found that Plaintiff was not disabled. (T. 9-18.) Plaintiff then filed a request for a review of Judge Muehlig's decision on January 26, 2004. (T. 8.) Plaintiff obtained new counsel, Gary P. Sarlo, Esq., in early February 2004 to represent him during his request for review, and for this action. (T. 19.) Plaintiff's new counsel forwarded additional medical evidence to the Appeals Council. (T. 177.) This additional medical evidence, however, was not part of the record before Judge Muehlig. On November 17, 2004, the Appeals Council denied Plaintiff's request for a review of Judge Muehlig's decision. (T. 5.) This action followed.

    **C.**    **Medical History**

        **1.**    **Evidence That Was Before the ALJ**

---

[1] " (T. _____.)" shall refer to pages within the administrative record, which has been submitted to the Court.

On January 24, 1999, Plaintiff reported neck pain after being involved in an automobile accident.[2] (T. 159.) A cervical spine MRI, conducted on September 22, 1999, revealed that Plaintiff had small-to-moderate central disc herniations at C4-5, C5-6, and C6-7. (T. 128.) At the C6-C7 level, Plaintiff's cord was slightly flattened with mild narrowing of the canal. (Id.) Also, at the C5-C6 level Plaintiff had disc herniation that was deforming the ventral cord; however, there was no evidence of abnormal signal or edema within the cord. (Id.)

Plaintiff was examined by Dr. Nasser Ani, an orthopedist, on October 15, 1999. His examination revealed limited range of motion in Plaintiff's neck, limited adduction of his shoulder, full motor strength in both upper extremities, and intact sensation. (T. 159.) Dr. Ani prescribed Vioxx as an anti-inflammatory medication and recommended that Plaintiff have an EMG and cervical epidural injection. (Id.) Plaintiff had the cervical epidural injection on October 20, 1999, and the EMG was performed on November 5, 1999. (T. 113, 57.) The EMG revealed acute right C5-6 radiculopathy with no evidence of plexopathy or peripheral neuropathy. (T. 157; see T. 222.) Plaintiff, however, continued to complain about neck and arm pain. (T. 156.)

On November 12, 1999, Dr. Ani reviewed the MRI which revealed that the C6-C7 herniation was much worse and causing cord compression. (T. 156.) On December 13, 1999, Plaintiff underwent two myleograms which revealed a normal cord, without significant cord compression.[3] (T. 190-91.) Dr. Ani reviewed the myleograms on February 2 and April 17, 2000.

---

[2] Two years prior to the auto accident, Plaintiff had surgery to correct an injured left ankle. (T. 244.)

[3] This was the last medical examination conducted on Plaintiff while he was still under insured status, pursuant to the Act. His insured status expired December 31, 1999.

(T. 154-55.) He noted disc herniation at C6-C7 and some minimal disc herniation at C5-C6. (Id.)

Plaintiff underwent spinal decompression and fusion surgery on May 16, 2000. (T.192.) Dr. Ani examined Plaintiff on May 23, 2000 and noted that Plaintiff's healing was going well. (T. 153.) Dr. Ani also noted, however, that Plaintiff was still complaining of pain in his neck and right groin. (Id.) X-rays of the cervical spine revealed good position of the hardware[4] that was implanted during Plaintiff's surgery, with no evidence of any abnormality. (Id.) Dr. Ani prescribed Percocet for pain. (Id.) Eight days later, Plaintiff's surgical sites had healed well and he reported that his neck was feeling better, but he still complained of radicular symptoms down his leg. (T. 152.)

On July 7, 2000, Plaintiff was seen again by Dr. Ani and his examination revealed significant neck stiffness although full strength was found in both upper extremities. (T. 126.) After looking at Plaintiff's x-rays, Dr. Ani noted that the status post anterior cervical discetomy and fusion at C5-6 and C6-7 were doing well, but also noted degenerative disc disease of the lumbar spine with disc herniation at L4-5. (Id.) Dr. Ani recommended that Plaintiff undergo an EMG of both lower extremities and a caudal block for his lower back; he also prescribed Vioxx for Plaintiff's pain. (Id.)

Plaintiff underwent an EMG on August 21, 2000 which revealed no evidence of lumbosacral radiculopathy, plexopathy, or peripheral neuropathy. (T. 150.) Dr. Ani next examined Plaintiff on September 8, 2000. At that time, Plaintiff felt that most of his pre-surgery

---

[4] Escalloped screws, grafts and a plate were all inserted into Plaintiff's back during his May 16, 2000 surgery. (T. 192, 93.)

symptoms were gone, and the examination revealed a normal gait, and intact motor power in both upper and lower extremities. (T. 125.) X-rays revealed satisfactory fusion at C5-6 and C6-7, an MRI revealed disc degeneration at L4-5 and disc herniation at L1-2, and an EMG of both lower extremities was negative. (Id.) Dr. Ani recommended that Plaintiff undergo a discogram and continue his physical therapy. (Id.)

Plaintiff underwent an EMG on September 26, 2000, which indicated the following conditions on his right upper extremity: grade IIa motor carpal tunnel syndrome; median and ulnar sensory neuropathy; cervical radiculopathy at C-6; and double crush syndrome. (T. 124.) On November 28, 2000, when Dr. Ani re-evaluated Plaintiff, he complained of lower back symptoms, but stated that medication improved these symptoms. (T. 148.) The examination revealed that straight leg testing was to 90° modified while sitting, Plaintiff's gait was normal, and his reflexes were brisk and symmetrical over both lower extremities. (T. 148.) One month later, Plaintiff told Dr. Ani that his neck was feeling better (compared to before surgery), but his lower back had been bothering him. (T. 147.) An examination revealed some limited range of motion in Plaintiff's neck, and intact motor power in both upper extremities. (Id.)

Plaintiff visited Dr. Ani again on April 11, 2001, and told Dr. Ani that he could not get a discogram (as recommended on September 8, 2000) because of insurance problems. (T. 146.) Plaintiff told the doctor that his neck felt better than before surgery, but he felt tightness around his trapezius muscle. (Id.) The anti-inflammatory medication, Vioxx, was effective for treating this discomfort. (Id.)

On December 19, 2002, Dr. He-Yeun Kahng conducted a consultative examination of

Plaintiff and noted Plaintiff's normal ambulation without any assistive device.[5] (T. 161-62, 65.) Plaintiff's cervical spine exhibited little movement in all directions for flexion, extension, and lateral rotation, and Plaintiff complained of stiffness and pain. (T. 162.) There was tenderness noted in the upper trapezius area on both sides, but no tenderness in the shoulder areas or the upper paracervical area. (Id.) Sensory and motor examinations found no deficits. (Id.) The lumbar spine flexed only to a 30° position, as Plaintiff could not go any further due to pain. (Id.) Straight leg raising was to 75° in the sitting position and 45° in the supine position on both sides.[6] (Id.) Dr. Kahng observed no significant edema nor any evidence of atrophy in any area on Plaintiff. (Id.) X-rays revealed status post cervical fusion, osteoarthritic changes of the cervical spine, status post internal fixation of the distal fibula, and minimal osteoarthritis on the left ankle joint, lumbar spine, and right wrist. (T. 165.) The assessment noted status post cervical fusion secondary to disc disease, limited motion of the cervical spine, and possible degenerative disc disease of the lumbar spine. The assessment also ruled out lumbosacral radiculopathy. (T. 162-63.)

On January 28, 2003 and March 31, 2003, the Disability Examiners for the Social Security Administration ("SSA") determined that Plaintiff suffered from a discogenic and degenerative back disorder, but was not disabled through December 31, 1999.[7] (T. 20-21.)

---

[5] Prior to visiting Dr. Kahng, Plaintiff had not seen a doctor for over 15 months. On September 11, 2002, Dr. Ani completed a report going over Plaintiff's diagnoses, which included: disc herniation at C5-6 and C6-7 with C5-6 radiculopathy; and degenerative disc disease of the lumbar spine with disc herniation at L4-5. (T. 142.)

[6] Turek's Orthaeopedic Principles and Their Application 479 (Fifth ed. 1994) at Table 13-8. ("Straight leg raising test results of supine and seated straight leg raising test should match.").

[7] It is unclear whether the Plaintiff was actually examined by the Disability Examiners. (T. 20-21.)

On January 23, 2004, Dr. Lilia Pineda, a State medical consultant, reviewed Plaintiff's record and assessed his residual functional capacity through December 31, 1999. (T. 167-74.) The doctor noted that Plaintiff had the ability to lift 20 pounds occasionally and 10 pounds frequently, could sit for six hours, and stand/walk for six hours in an eight-hour workday.[8]  (T. 168.)

At the hearing held before the ALJ, orthopedic surgeon Dr. Marvin Chirls reviewed the above evidence and testified as a medical advisor. (T. 234-42.)  Dr. Chirls stated that after Plaintiff's auto accident, testing showed herniated discs and some degeneration.  (T. 234.)  He testified that the September 2000 EMG was normal, and that  Plaintiff's back examination showed degenerative disease, but no evidence of a herniated disc as his lower extremities were neurologically normal.  (T. 234-35.)  X-rays showed fusion, minimal degeneration, possible disc herniation, and minimal degenerative changes to the right wrist and left ankle.  (T. 235.)  Dr. Chirls also testified that there were no physical findings to substantiate the diagnosis of herniation, that there were no sensory deficits, and no atrophy.  (T. 235-36.)  Dr. Chirls further opined that there was no reason for Plaintiff's extremely limited neck motion. (T. 239.) According to the doctor, 50% of neck motion occurs above where Plaintiff was operated on.[9] (Id.)  Because there is no pathology at C1-2 and at the skull, there was no reason why Plaintiff should not be able to move his neck.  (T. 239-40.)

---

[8] This qualifies as "light work" under the SSA.  20 C.F.R. § 404.1567(b).

[9] Dr. Chirls further elaborated in his testimony:
In other words, 50 percent of motion of the cervical spine is between the skull and C1, and C1-C2. So that when this surgery is performed, the patients may lose motion as far as rotation is concerned in the lower part of the cervical spine which adds to 50 percent. But there is no reason why he should not be able to move his neck . . . [b]ecause there is not pathology at C1-2 and at the skull.
(T. 239.)

### 2. Additional Medical Evidence Subsequently Introduced to the Appeals Council

After receiving an unfavorable decision at the Hearing, and obtaining new counsel, Plaintiff forwarded copies of additional medical information to the Appeals Council. (T. 177.)[10] (Id.) Plaintiff submitted to the Appeals Council diagnostic test reports, rehabilitation reports, physical therapy progress notes, an EMG report, and, most notably, the full Operative Report of Plaintiff's cervical surgery. (T. 177, 78.)

These additional records generally document different courses of action to diagnose and treat Plaintiff's complaints of both cervical and lumbar pain. For example, an April 12, 1999 bone scan revealed a single abnormal focal area in the ulna carpal joint.[11] (T. 188.) Further, an MRI conducted on November 19, 1999 revealed that Plaintiff had degenerative disc and facet changes at L1-2 and L4-5, with a superimposed small central tear at L4-5. (T. 189.) Lastly, the Operative Report submitted by Dr. Ani on May 16, 2000, upon which Plaintiff relies heavily in this appeal, detailed Plaintiff's preoperative and postoperative diagnoses.[12] (See T. 192-95.) In short, these medical records submitted to the Appeals Council note Plaintiff's continuing complaints of cervical and lumbar pain arising from his involvement in the January 1999 auto accident, and continuing beyond the cervical fusion surgery.

### D.     January 7, 2004 Decision

---

[10] Plaintiff believed there to be a discrepancy in the number of pages that were before the ALJ when he made his decision, and the number of pages in the complete medical record. Plaintiff also alleges that Dr. Chirls, who offered expert testimony at the Hearing, did not have the complete medical records available for his review.

[11] The bone scan was ordered by Dr. J. Hochberg. (T. 188.)

[12] Plaintiff was discharged from the hospital one day after the surgery. His principal diagnosis was "displacement of cervical intervertebral disc without myelopathy," and his secondary diagnosis was "degeneration of cervical intervertebral disc." (T. 196.)

In the January 7, 2004 decision, Judge Muehlig found that Plaintiff was not disabled within the meaning of the Social Security Act, and therefore was not entitled to Disability Insurance Benefits. (T. 18.)

The ALJ made the following findings: (1) claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits and was insured for benefits through December 31, 1999; (2) claimant had not engaged in substantial gainful activity since the alleged onset of his disability; (3) claimant had an impairment or combination of impairments considered "severe" based on the requirements provided in 20 C.F.R. § 404.1520(b); (4) those medically determinable impairments do not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing"); (5) claimant's allegations regarding his alleged disability were not totally credible; (6) all of the medical opinions in the record regarding the severity of the claimant's impairments were carefully considered; (7) the claimant retained the residual functional capacity to perform the exertional demands of medium work (20 C.F.R. § 404.1527); (8) claimant's past relevant work as a night club owner/bartender did not require the performance of work-related activities precluded by his residual functional capacity; (9) claimant's medically determinable orthopedic impairments of the back and neck did not prevent him from performing his past relevant work; and (10) claimant was not under a "disability" as defined in the Act, at any time through the date of the decision.

## II    DISCUSSION

### A.    Standard of Review

In reviewing an ALJ's denial of Social Security disability benefits, this Court must determine whether or not the decision was supported by "substantial evidence in the record." 42

U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means more than "a mere scintilla." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)). "It means such relevant evidence as a reasonable mind might accept as adequate." Id. If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The Third Circuit has made it clear "that determination of the existence vel non of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) (emphasis in original). In reaching a conclusion that a claimant is capable of performing work, the ALJ must analyze all the evidence and explain the weight the ALJ has given to probative exhibits. Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978). Access to the ALJ's reasoning is essential to a meaningful court review. Fargnoli, 247 F.3d at 42. Nevertheless, a District Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

**B.    Standard for Awarding Benefits Under the Act**

An individual attempting to claim disability insurance benefits under the Act must first meet statutory insured status requirements. See 42 U.S.C. § 423, Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). To achieve disabled status, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant will not be considered disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To demonstrate that a disability exists, Congress has clearly established the type of evidence necessary to prove the existence of a disabling impairment by defining it as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). An individual's subjective complaints are not enough to establish a disability. Furthermore, the claimant bears the burden of proving the existence of a disability. 42 U.S.C. § 423(d)(5)(A).

The Social Security Administration has set forth a five-step sequential analysis for evaluating whether or not a claimant is disabled. 20 C.F.R. § 404.1520. First, the ALJ must determine if the claimant is currently engaged in substantial activity. If so, he will be found not disabled, and the application is denied. 20 C.F.R. § 404.1520(b). If not, the ALJ proceeds to step two and determines whether or not the claimant has a "severe" impairment. 20 C.F.R. § 404.1520©. If a "severe impairment" or "combination of impairments" are present, at step three the ALF determines whether the impairment(s) meets or equals the criteria of an impairment in the Listing. 20 C.F.R. Part 404, Subpt. P, App. 1. If so, the claimant is conclusively presumed to be disabled, and the evaluation ends. 20 C.F.R. § 404.1520(d). Additionally, at this step, the

ALJ is responsible for determining the claimant's residual functional capacity.[13]  (T. 15.)   If the impairment or impairments do not meet the Listings in step three, then the ALJ must proceed to step four, where a determination is made on whether the limits imposed by claimant's impairment prevent the claimant from returning to past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is found capable of performing his past relevant work, the claimant is not disabled.  Id.  If the claimant is no longer able to perform his past relevant work, the evaluation must continue to step five, (where the burden shifts to the Commissioner).  At this final step of the evaluation process, the Commissioner determines whether the claimant is capable of performing some other work available in the national economy, given his age, education, work experience and residual functional capacity.  20 C.F.R. § 404.1520(f).  Benefits are denied if claimant is capable of performing work in the national economy, given the above-listed factors.

Thus, the language of the statute proves Congressional intent to limit the payment of disability insurance benefits to only those cases where the Plaintiff has demonstrated, by objective medical findings, that he suffers from an impairment of such severity that he can no longer perform any work existing in the national economy.

### C.    Plaintiff's Appeal

In this appeal, Plaintiff makes two arguments.  First, he argues that the ALJ's decision was not supported by substantial evidence.  Plaintiff submits that Judge Muehlig "ignored

---

[13]"'Residual functional capacity'" is "a term which describes the range of work activities the claimant can perform despite his impairments."  (T. 15.) (See 20 CFR 404.1529; Social Security Ruling 96-7p).  In assessing the claimant's residual functional capacity, consideration must be given to subjective allegations.
  In evaluating subjective complaints, the [ALJ] must give careful consideration to all avenues presented that relate to such matters as: [1.] The nature, location, onset, duration, frequency, radiation, and intensity of any pain; [2.] Precipitating and aggravating factors. . .; [3.] Type, dosage, effectiveness, and adverse side-effects of any pain medication; [4.] Treatment, other than medication, for relief of pain; [5.] Functional restrictions; and [6.] The claimant's daily activities. (Id.)

medical records" which would have supported a finding that Plaintiff's impairments equate to one provided in the Listing. (Pl. Br. 2.) Second, Plaintiff argues the ALJ committed legal error by: (1) failing to insure that he had every relevant medical record before making his assessment; (2) dismissing claimant's subjective judgements on his condition; and (3) dismissing the opinions of the DDS physicians. (Id.) For the reasons that follow, the Court rejects Plaintiff's arguments and affirms the ALJ's determination.

### 1. Substantial Evidence Supports the ALJ's Finding

Plaintiff has no impairment or combination of impairments at the level of severity contemplated by the Listings that would entitle him to Disability Insurance Benefits ("DIB") from January 25, 1999, the alleged onset date of his impairment, through December 31, 1999, the date his insured status expired. The evidence of record supports the ALJ's finding that Plaintiff failed to establish that he incurred a disability severe enough to preclude him from engaging in any kind of substantial work, for a period of not less than 12 months. Plaintiff Asserts that Judge Muehlig failed to properly consider whether Plaintiff's impairment met or equaled the severity of those in the Listing, and challenges the ALJ's findings at step three in the evaluation process.

Regarding the third evaluation step, the ALJ offered the following analysis:

> [T]he claimant has no impairment which meets the criteria of any of the listed impairments described in [20 CFR, Part 404, Subpart P, Appendix 1]. No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Particular scrutiny was given to the claimant's condition in light of Listing 1.00, the Musculoskeletal System. Specifically, Listing 1.04 of Appendix 1 is neither met nor equaled due to the *absence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis*. . . . [The ALJ found] that the claimant retains the residual functional capacity to perform the exertional demands of medium work, or work which requires lifting and carrying up to fifty pounds occasionally and twenty-five pounds frequently . . . . [T]here are no significant non-exertional limitations which narrow the range of work [claimant] can perform.

(T. 13, 16.) (emphasis added).

In support of this conclusion, the decision contains an in-depth summary of the reports from Plaintiff's physicians. (T. 13-18.) The ALJ also considered statements made by the Plaintiff but found Plaintiff's subjective allegations of his limitations not credible. (Id.)

To that extent that Listing 1.04 is at issue, that Listing requires a spinal disorder which results in the compromise of the spinal cord or nerve root with: "A. Evidence of nerve root compression characterized by motor loss, reduction in motion, and sensory and reflex loss; or B. Spinal arachnoidotis confirmed by operative note or pathology report; or C. Lumbar spinal stenosis resulting in pseudoclaudation." 20 C.F.R. Part 404, subpart P, App. 1 Listing 1.04. Plaintiff argues that Part A of the Listing is satisfied by Dr. Ani's comment that "pain with radiculopathy[14] would appear to support a finding of nerve root compression . . . ." (Pl.'s Br. 7.)

Although the ALJ found an "absence of nerve root compression," Plaintiff argues that radiculopathy, coupled with herniation in the cervical region would effectively contradict the ALJ's finding. (Id.) The ALJ, however, found these allegations to not be medically verifiable and to be speculative. Plaintiff supplements his argument by pointing to his continuous complaints of pain since the day of his car accident until his surgery. (Pl. Br. 7, 8.) Additionally, Plaintiff introduced the argument that an impingement on the spinal cord is the medical equivalent of "nerve root compression". (Pl.'s Br. 9.) To support this argument, Plaintiff relies upon Dr. Ani's Operative Report of May 16, 2000 which notes, "a free fragment of disk material

---

[14]Radiculopathy is a disease of the spinal nerve roots, producing pain, numbness, or weakness radiating from the spine. Although symptoms of radiculopathy are similar to those caused by nerve compression, electrodiagnostic studies (e.g. x-rays, MRIs, EMGs) can distinguish radiculopathy from other diagnoses.

14

impinging on the cord . . . ."[15]  (T. 192.)  Plaintiff bears the burden of proving that impingement is the medical equivalent to compression, and in failing to do so, he cannot rely on the ALJ to address this issue.[16]

The ALJ's finding is supported by substantial evidence in the record.  Judge Muehlig scrutinized the medical evaluations of Dr. Ani and Dr. Kahng, and there was a general consensus that Plaintiff's back and neck condition significantly improved after his decompression and fusion surgery.  (See T. 14.)  Several examinations, both before and after the surgery, noted intact motor power on both upper extremities, and intact sensation.  (T. 13-15.)  These examinations also revealed a normal gait, brisk and symmetrical reflexes over both lower extremities, and normal sensory functions.  (T. 14-15.)  Dr. Chirls, in his testimony at the initial hearing, suggested that there was no objective reason for Plaintiff's extremely limited neck motion.  (T. 239-40.)  Dr. Chirls's testimony also noted that although MRIs revealed herniated cervical discs and disc degeneration, Plaintiff was neurologically intact.  (T. 16.)  The record is devoid of any doctor advising Plaintiff not to work, or offering that Plaintiff's back and neck injuries precluded him from working.

Additionally, the ALJ's finding that Plaintiff retained the residual functional capacity to perform medium work is supported by substantial evidence.  Dr. Chirls testified, based on the examinations by Dr. Kahng, that there was no atrophy in Plaintiff's lower extremities, and his leg

---

[15]This report was allegedly not before the ALJ.  The impinging fragment was successfully removed during the surgery.  (T. 192.)

[16]Plaintiff attempts to equate compression with impingement by referring to Judge Muehlig's decision, in which the Judge states that "there was no sign of any cord compression or impingement."  (T. 16.)  This "or" clause leads Plaintiff to believe that compression and impingement are equivalent, but this argument is not medically verified.

raising abilities were very good. (Id.) Based on the foregoing, the ALJ found that Plaintiff is capable of the degree of exertion required by medium work.[17] (Id.)

Thus, there is a great deal of evidence offered by examining physicians that although Plaintiff does suffer from orthopedic impairments, they are nonetheless not to the degree that would place claimant under a "disability" as defined in the Social Security Act. See 20 CFR § 404.1520(e).

Proceeding to step four, the ALJ found that because "claimant's past work did not require the performance of work activities precluded by his medically determinable impairments, he is able to perform the demands of his past relevant work . . . as it is generally performed in the national economy."[18] (T. 17.) In the Disability Report that Plaintiff submitted, he described the lifting and carrying responsibilities of his job as a club owner/bartender, entailing lifting no more than 40 pounds at a time. (T. 90.) This would qualify as "medium work" under the Act, and because the ALJ found that Plaintiff retained this degree of residual functional capacity, he is not disabled within the meaning of the Act. Accordingly, the ALJ's determination that Plaintiff was not entitled to receive DIB was supported by substantial evidence.

### 2.     The ALJ Properly Evaluated All Admitted Medical Evidence

Plaintiff seeks reversal of the decision of the ALJ by submitting that the ALJ failed to insure that he had all medical records when he made his decision. Plaintiff argues that it is the

---

[17] Medium work "requires lifting and carrying up to fifty pounds occasionally and twenty-five pounds frequently; and, in the course of an eight-hour workday, sitting, standing and/or walking up to six hours." (T. 16, see also 20 CFR 404.1567©.)

[18] The phrase "past relevant work" is defined in CFR § 404.1565. The work usually must have been performed 15 years prior to the date of the onset of an alleged disability, and the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity. (T. 17.)

duty of the ALJ to ensure that he has all the relevant medical evidence before forming his evaluation.  Plaintiff alleges that the medical records submitted to the Appeals Council were merely copies of evidence originally introduced to the ALJ.[19]  The Third Circuit has explained, that in Social Security cases seeking remand in district court, "it is . . . [sound] policy to require claimants to present all material evidence to the ALJ and prohibit judicial review of new evidence unless there is a good reason for not having brought it before the ALJ."  Matthews v. Apfel, 239 F.3d 589, 595 (3d Cir. 2001).  Further, in reviewing an ALJ's decision this Court shall consider only evidence actually presented to the ALJ.  "[E]vidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence." Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) (citing Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991)).

      Plaintiff questions whether the ALJ had all relevant medical records when he made his decision, based on the absence of indicators in the decision that all records were present.  (T. 177.)  The Third Circuit has held that an ALJ must "set forth the reasons for his decision," and that a bare conclusory statement that an impairment failed to meet a listed impairment is insufficient.  Burnett v. Commissioner of SSA, 220 F. 3d 112, 119-20 (3d Cir. 2000).  The Third Circuit later went on to state that "the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (citing Burnett at 120).  The Commissioner submitted that all appropriate factors were considered in concluding that Plaintiff failed to prove that he had

---

[19]It is unclear whether some of the evidence Plaintiff introduced to the Appeals Council was part of the original record, or if some of it was submitted for the first time.

a disability, and that the relevant medical reports "had enough information to evaluate [Plaintiff's] condition." (T. 24.) Additionally, the ALJ's decision, read as a whole, demonstrates that he evaluated all relevant evidence. (T. 12-18).

Plaintiff relies heavily on his own subjective complaints, as well as the opinions rendered by the DDS physicians, when arguing that his impairments make him disabled. However, the ALJ afforded these two "evaluations" little weight because they are inconsistent with the medical evidence of record. Claimant's statements concerning his impairments were considered by the ALJ and found to be not credible because they are in sharp contrast with every examining doctor's evaluation. The restricted residual capacity assessed by the DDS physicians was also not consistent with the medical record.[20] Also, the ALJ determined that the DDS physicians were not able to question the Plaintiff or Dr. Chirls, and therefore could not be comprehensive enough to gain much credence. (See T. 17.)

Additionally, Plaintiff claims that the Operative Reports of his cervical surgery, which were forwarded to the Appeals Council after the adverse decision by the ALJ (T. 177-222), shed light on the extent of Plaintiff's cervical and lumbar impairments. (Pl.'s Br. 8.) These records, primarily distributed by Dr. Hochberg and Dr. Ani, mostly document claimant's complaints of pain. Plaintiff contends that if these Operative Reports (which offer no medically verifiable diagnoses and merely rehash claimant's complaints of pain) were part of the record during the initial hearing, Dr. Chirls's testimony may have come out differently. (Pl.'s Br. 9.)

Although the Plaintiff alleges to the contrary, the ALJ, in fact, "carefully considered all of

---

[20] The DDS physicians' evaluations suggested that Plaintiff was only able to lift 20 lbs. occasionally, and 10 lbs. frequently. That is, Plaintiff would have been considered to only retain the ability to do light work. (T. 168) (See 20 C.F.R. §404.1567(b).)

the medical opinions in the record regarding the severity of claimant's impairments." (T. 18.) At the original hearing, however, Plaintiff's counsel reviewed the file and stated that it appeared to be complete and there was no additional evidence he could offer. (T. 225.) The ALJ summarized Plaintiff's complaints of pain, medical reports offered by examining physicians, and gives logical explanations why some types of evidence were weighed more heavily than others. Nevertheless, as noted previously, evidence which was not before the ALJ cannot be used to assert that the decision was not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594.

Therefore, although Plaintiff alleges that the ALJ did not properly assess all evidence introduced (including the records which were introduced to the Appeals Council), all relevant evidence was evaluated and the ALJ's decision was supported by substantial evidence in the record.

## III.    CONCLUSION

For all of the foregoing reasons, the Court finds that the ALJ's decision was supported by substantial evidence and is hereby **AFFIRMED,** and plaintiff's appeal is **DENIED**. An appropriate Order will follow.

Dated: August 11, 2006

        /s/ Stanley R. Chesler, U.S.D.J.
            United States District Judge